*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* CARPENTER, Minors.

UNPUBLISHED
August 22, 2025
12:25 PM

No. 372298
Eaton Circuit Court
Family Division
LC No. 20-020308-NA

Before: K. F. KELLY, P.J., and MARIANI and ACKERMAN, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to her four children, MC1, NC, MC2, and WC, pursuant to MCL 712A.19b(3)(g) (failure to provide proper care and custody despite financial ability to do so) and (j) (reasonable likelihood of harm if returned to parent). We affirm.

## I. BACKGROUND

Respondent and her husband at the time[1] adopted the children in 2016 after the parental rights of the children's biological parents were terminated. Shortly thereafter, respondent and the children's father separated but continued to live together and share equal responsibility for the children. Around the same time, respondent began a relationship with a man who would eventually become her live-together partner.[2] The man had been convicted in 2006 of multiple criminal

---

[1] As discussed in this opinion, respondent and her husband subsequently separated and respondent eventually filed for divorce. For ease and simplicity, this opinion will refer to the husband as the children's father. The children's father was not a respondent in this case.

[2] Respondent had already known the man and had first met him several years earlier when she was 14 years old and he was approximately 20 or 21 years old.

-1-

sexual conduct (CSC) offenses for sexually abusing a minor,[3] and respondent began her relationship with him while he was still incarcerated for those convictions. Respondent was aware of the nature of those convictions when the two began their relationship. Respondent's partner was released from prison in July 2020, and respondent's relationship with him picked up.

Around March 2021, Children's Protective Services (CPS) began an investigation when MC2 was hospitalized for behavioral issues, during which CPS learned of respondent's relationship with her partner. As a result, CPS went through its "duty to warn" process and advised respondent of her partner's CSC convictions and not to allow him to have unsupervised contact with the children. Respondent indicated that she was already aware of the convictions and that she did not believe the advice to be particularly relevant at that time because she had not yet introduced her partner to the children.

Respondent eventually introduced her partner to the children in July 2022, and by September 2022, respondent, her partner, and the children were all living together in the home of a family friend. At this time, CPS again advised respondent not to leave her partner unsupervised with the children based on his criminal history, and respondent signed a written safety plan agreeing not to do so. In January 2023, respondent purchased her own home, and the children moved in with her approximately one month later. Then, in March 2023, pursuant to respondent's request, her partner moved in with them. In July 2023 respondent formally filed for divorce from the children's father, and pursuant to a September 2023 interim custody order, she obtained sole legal custody of all four children and sole physical custody of MC1.

Sometime in October 2023, MC1 disclosed to a friend that respondent's partner had sexually abused WC, who was approximately nine years old at that time. Law enforcement and CPS immediately began an investigation and, pursuant to a voluntary safety plan, the children were placed with their father.[4] The children were then forensically interviewed, and during those interviews they disclosed that respondent had frequently left them unsupervised with her partner and that respondent's partner had, on multiple occasions, sexually abused WC and masturbated in front of them. The children also disclosed that they had heard acts of domestic violence between respondent and her partner and that they had observed bruises on respondent.

Based on this information, DHHS filed a petition requesting that the trial court remove the children from respondent's care, take jurisdiction over the children, and terminate respondent's parental rights at initial disposition. On the same day, the presiding judge in respondent's divorce action entered an ex parte order temporarily suspending respondent's parenting time. Then, following a preliminary hearing, the court in the instant child-protective proceedings authorized DHHS's petition, instructed that the children remain out of respondent's care and in the care of

---

[3] The record indicates that respondent was convicted of various CSC offenses involving a victim between the ages of 13 and 15 years old, including one count of CSC-III for sexual penetration of a 13-year-old girl and two counts of CSC-IV for sexual contact with the same victim.

[4] MC1 was initially placed with her maternal aunt (respondent's sister), but she moved in with her father approximately one week later.

their father under the supervision of DHHS, and suspended respondent's parenting time due to the severity of the sexual-abuse allegations.

A four-day adjudication trial was conducted in June 2024. After the close of proofs, the jury returned its verdict, finding that all four children were "subject to a substantial risk of harm to [their] mental well-being" and that, "by reason of neglect, cruelty, drunkenness, criminality, or depravity," respondent's home was "an unfit place for [the children] to live." The trial court thereafter entered an order of adjudication exercising jurisdiction over the children pursuant to MCL 712A.2(b)(1) (substantial risk of harm to mental well-being) and (2) (unfit parental home).

In July 2024, the trial court conducted an initial dispositional hearing. Because DHHS petitioned for termination at initial disposition, the hearing also served as a termination hearing. After considering all the evidence and testimony provided by the parties, the court found that clear and convincing evidence established grounds for termination of respondent's parental rights under MCL 712A.19b(3)(g) and (j) and that a preponderance of the evidence established that termination was in the children's best interests. The trial court subsequently issued an order terminating respondent's rights as previously described. This appeal followed.

## II. AUTHORIZATION OF PETITION

Respondent first argues that the trial court erred by authorizing the petition after the preliminary hearing because she did not pose a substantial risk of harm to the children's mental well-being.

We review for an abuse of discretion a trial court's decision to dismiss or authorize a petition following a preliminary hearing. *In re Nikooyi*, 341 Mich App 490, 494; 991 NW2d 619 (2022). A trial court abuses its discretion when its decision falls outside the range of reasonable and principled outcomes or when it makes an error of law. *Id*. We review for clear error a trial court's factual findings. *In re McCarrick/Lamoreaux*, 307 Mich App 436, 463; 861 NW2d 303 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re Matamoros*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 371544); slip op at 4 (quotation marks and citation omitted).

"Child protective proceedings are initiated when a petition is filed in the trial court that contains facts constituting an offense against a child under MCL 712A.2(b) of the juvenile code, MCL 712A.1 *et seq*." *In re Leach*, 347 Mich App 26, 31; 14 NW3d 178 (2023) (quotation marks and citation omitted). After the petition is filed, "the trial court must hold a preliminary hearing and may authorize the filing of the petition upon a finding of probable cause that one or more of the allegations [in the petition] are true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)." *In re Ferranti*, 504 Mich 1, 15; 934 NW2d 610 (2019). Relevant to this case, the trial court may exercise jurisdiction over a child "who is subject to a substantial risk of harm to his or her mental well-being," MCL 712A.2(b)(1), or "[w]hose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the [child] to live in," MCL 712A.2(b)(2). "To determine whether jurisdiction exists, the trial court must examine the child's situation at the time the petition was filed because MCL 712A.2(b) speaks in the present tense." *Leach*, 347 Mich

App at 32 (quotation marks, citation, and alteration omitted). When a trial court authorizes a petition, the matter proceeds to the adjudication phase so that the court can "determine whether to exercise jurisdiction over the child[.]" *Nikooyi*, 341 Mich App at 496. But when a trial court declines to authorize the petition, the petition is dismissed. See *Leach*, 347 Mich App at 31-32.

Respondent argues that she did not pose a substantial risk of harm to the children at the time that DHHS filed the petition because, pursuant to a safety plan, the children were placed with relatives without any visitation with respondent at that time. It is undisputed that the children's relative placements following removal from respondent's care were safe and suitable for the children. But the fact that respondent did not have immediate and direct access to the children, "plus the child[ren]'s safe placement with another parent, does not eliminate the possibility of mental or emotional harm to" the children caused by respondent's actions. *Id*. at 33. And it is clear from the record that the petition alleged sufficient facts for the trial court to find probable cause that at least one of the allegations in the petition was true and could support its exercise of jurisdiction under MCL 712A.2(b)(1) and (2). See *Ferranti*, 504 Mich at 15.

Regarding MCL 712A.2(b)(1), the petition alleged—and testimony at the preliminary hearing supported—that the children were subject to a substantial risk of harm to their emotional well-being because none of the children felt safe living in respondent's home and all of the children—but MC1 and WC in particular—struggled emotionally while in respondent's care. The CPS investigator testified that all of the children reported during their forensic interviews that they did not feel safe living in respondent's home. WC disclosed during her forensic interview that respondent's partner had sexually abused her multiple times, that respondent's partner frequently stood by her bedroom door and watched her, and that she was afraid to sleep with the door open because she was afraid that someone would come into her room at night. MC1 indicated that she was constantly emotionally distraught while living with respondent, namely due to the sexual abuse and misconduct by respondent's partner, and she engaged in self-harming behaviors as a result. And when investigators first investigated the sexual-abuse and misconduct allegations, they observed MC1 crying after respondent refused to let her leave the home. Additionally, NC and MC1 reported that respondent regularly forced the children to do household chores for hours before they were permitted to eat dinner, that they frequently did chores until midnight despite a 5:30 a.m. wake-up time for school, and that they were typically left to feed themselves. We see no abuse of discretion in the trial court's authorization of the petition on this basis. See *Nikooyi*, 341 Mich App at 494.

As for MCL 712A.2(b)(2), it, as noted above, does not require a showing of a substantial risk of harm for the court to assume jurisdiction over the children. Rather, the provision only requires a showing that a respondent's home is an "unfit place" for the children to reside due to "neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian[.]" MCL 712A.2(b)(2). The petition in this case alleged that respondent's home was unsafe for the children to live in, namely due to respondent's decisions to allow her partner—a registered sex offender for his sexual abuse of a minor—to live with her and the children and to be around the children unsupervised, as well as her partner's repeated sexual abuse of WC and sexual misconduct around all four children. The petition further alleged that respondent's home was unsafe because respondent had previously been convicted of third-degree

child abuse for disciplining NC with a belt, and NC reported that respondent still used "excessive discipline" on the children.[5]

There was ample testimony presented at the preliminary hearing in support of these allegations. A recording of each child's forensic interview was submitted to the court as evidence, and the CPS investigator testified that during their forensic interviews, MC1, NC, and WC disclosed that respondent's partner had repeatedly masturbated in front of them while looking at MC1 or WC. Additionally, WC disclosed that respondent's partner had sexually abused her on multiple occasions, and both MC1 and NC disclosed that they had witnessed respondent's partner sexually abusing WC more than once. Testimony also established that respondent knew that her partner had previously been convicted for sexually abusing a minor before she began dating him and that, despite multiple warnings from DHHS that he should not be left unsupervised around the children, respondent nonetheless moved her partner into her home and frequently left him alone with the children. The CPS investigator also testified that respondent had previously been convicted of third-degree child abuse for using a belt to discipline NC.

In sum, there were allegations and evidence that the criminality and depravity of respondent and respondent's partner, a "nonparent adult" living with the children at respondent's behest, left the children in an unsafe home environment where they were exposed to sexual misconduct and abuse, as well as domestic violence. MCL 712A.2(b)(2). Thus, on this record, there was probable cause that the allegations in the petition were true and could support the trial court's exercise of jurisdiction under MCL 712A.2(b)(2). See *Ferranti*, 504 Mich at 15. Accordingly, the trial court did not clearly err by finding as much, see *McCarrick/Lamoreaux*, 307 Mich App at 463, and it did not abuse its discretion by authorizing the petition on this basis, see *Nikooyi*, 341 Mich App at 494.

## III. DISCOVERY

Respondent also argues on appeal that the trial court committed reversible error by continuing with the adjudication trial despite the fact that DHHS did not produce certain witness statements pursuant to MCR 3.922(A), which governs pretrial discovery in child-protective proceedings. Specifically, respondent argues that she is entitled to relief because, during trial, she discovered while questioning a detective witness that DHHS failed to produce written and recorded statements from respondent's friend and her friend's daughter that were obtained during the detective's investigation, and this failure prejudiced her ability to present her defense theory that WC's disclosures of sexual abuse during her forensic interview were tainted and unreliable due to repeated questioning about the abuse by friends and family before the interview occurred.

Although respondent brought some discovery issues to the trial court's attention during the pretrial stage of the proceedings below, she never raised any objection or challenge to this

---

[5] The petition also alleged that respondent was a victim of domestic violence and that the children had heard multiple domestic-violence incidents between respondent and her partner, but for reasons discussed later in this opinion, we do not consider any of this information for purposes of disposing of respondent's challenges on appeal.

particular discovery issue during trial when she was first made aware of it, so the trial court was never asked to address DHHS's alleged transgressions at that time. As a result, this issue is unpreserved for appellate review. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227-228; 964 NW2d 809 (2020). Unpreserved claims of error and "adjudication errors raised after the trial court has terminated parental rights are reviewed for plain error." *Ferranti*, 504 Mich at 29. To obtain appellate relief under the plain-error standard of review, a respondent first must show: (1) an error occurred, (2) the error was clear or obvious, and (3) the error affected substantial rights. *In re MJC*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 365616); slip op at 2. "Generally, an error affects substantial rights if it caused prejudice, i.e., it affected the outcome of the proceedings." *Id.* (quotation marks and citation omitted). After the respondent has satisfied these requirements, "an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted when the plain, forfeited error seriously affected the fairness, integrity or public reputation of judicial proceedings." *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020) (quotation marks, citations, and ellipses omitted).

As noted, respondent argues that she is entitled to relief because DHHS failed to produce written and recorded statements in violation of MCR 3.922(A), which provides, in relevant part:

> (1) The following materials are discoverable as of right in all proceedings and shall be produced no less than 21 days before trial, even without a discovery request:

> * * *

> (b) all written or recorded statements made by any person with knowledge of the events in possession or control of petitioner or a law enforcement agency, including, but not limited to, police reports, allegations of neglect and/or abuse included on a complaint submitted to Child Protective Services, and Child Protective Services investigation reports, except that the identity of the reporting person shall be protected in accordance with MCL 722.625[.]

Respondent, however, has failed to establish that any plain error occurred on this basis, or that any such error affected her substantial rights. See *MJC*, ___ Mich App at ___; slip op at 2; *Pederson*, 331 Mich App at 462-463.

To start, respondent bears the burden of establishing the factual predicate of her claim, and she has not done so here. See *People v Elston*, 462 Mich 751, 762; 614 NW2d 595 (2000). During the adjudication trial, the detective testified that she interviewed respondent's best friend as part of her investigation and that, although she did not personally take a written statement from respondent's best friend, she "believed" that a written statement from the friend existed. The detective also "believed" that the interview was recorded on her work phone, but she could not recall whether she had, in fact, recorded the interview or, even if she had, whether she provided that audio recording to DHHS. The detective also testified that she interviewed the daughter of respondent's best friend and that she had provided the "audio or video recording" of that interview to DHHS, but the substance of the interview was not made known at trial.

-6-

From this testimony, it is impossible to conclude with any degree of certainty that the detective actually had any written or recorded statements from respondent's best friend to provide to DHHS or that the audio recording of her interview with the daughter of respondent's best friend (which had been provided to DHHS) was relevant to the allegations at issue in these proceedings. See MCR 3.922(A)(1)(b). And because respondent never challenged the allegedly missing discovery at the time she purportedly discovered the omission—i.e., during the detective's testimony at trial—neither DHHS nor its counsel were able to weigh in on or clarify the matter. Respondent does not point to anything else in the record or provide any additional offer of proof on appeal to lend any factual support to her claim. See *Elston*, 462 Mich at 762. Respondent has not shown on this record that a plain error occurred.

Respondent has similarly failed to show that her substantial rights were affected or that the alleged error somehow affected the outcome of the proceedings. See *MJC*, ___ Mich App at ___; slip op at 2; *Pederson*, 331 Mich App at 462-463. Even without the written and recorded statements, respondent was still able to present her defense theory that WC's disclosures during her forensic interview were tainted and unreliable due to repeated questioning by friends and family about the abuse before the interview occurred. Indeed, during cross-examination by respondent's counsel, the detective testified that she determined that both respondent's best friend and the children's father had questioned WC about the sexual abuse alleged in the petition prior to WC's forensic interview, that neither were "trained in any type of forensic interview protocol," and that their discussions with WC before the forensic interview could "be a potential problem for [the] investigation" due to the "suggestibility and taint" of WC as a witness. From this testimony, respondent could—and did—argue that any disclosures by WC were unduly influenced by other parties. Moreover, WC's testimony aside, MC1 and NC each testified about the sexual abuse and misconduct by respondent's partner, and their testimony was both detailed and consistent with one another. Even if additional evidence could have been gleaned from the purportedly missing statements, there is nothing to suggest that it would have discredited or otherwise had any relevance to this testimony.

Accordingly, because respondent has failed to establish plain error affecting her substantial rights, she is not entitled to relief on this issue. See *MJC*, ___ Mich App at ___; slip op at 2; *Pederson*, 331 Mich App at 462-463.

## IV. JURY INSTRUCTIONS

Respondent also argues that the trial court erred when instructing the jury at the adjudication trial because the court used Model Civil Jury Instruction 97.36 for the definition of "neglect" rather than the definition found in MCL 712A.2(b)(1)(B) and MCL 722.602(1)(d) that was clearly contemplated by the Juvenile Code, MCL 712A.1, *et seq*. Claims of instructional error involve questions of law that we review de novo. *In re Piland*, 336 Mich App 713, 720; 972 NW2d 269 (2021). "A trial court's determination regarding whether a jury instruction is applicable to the facts of the case is reviewed for an abuse of discretion." *Id*. An instructional error warrants reversal only "if it resulted in such unfair prejudice to the complaining party that the failure to vacate the jury verdict would be inconsistent with substantial justice." *Ward v Consol Rail Corp*, 472 Mich 77, 84; 693 NW2d 366 (2005) (quotation marks and citations omitted).

In this case, respondent, during a pretrial hearing to address her motion for special jury instructions, expressly stipulated to the specific language used by the trial court to instruct the jury on the definition of "neglect." And immediately thereafter, the court issued a stipulated order reflecting this stipulation, which respondent never objected to. Indeed, when the trial began four days later, respondent still did not raise any concerns regarding the stipulated order. "A party cannot stipulate to a matter and then argue on appeal that the resultant action was error," and allowing the party to do so "would be to [improperly] permit that party to harbor error as an appellate parachute." *LeFever v Matthews*, 336 Mich App 651, 670 n 3; 971 NW2d 672 (2012) (quotation marks, citation, and alteration omitted). Accordingly, respondent has waived this claim of error. See *id.*

Regardless, respondent fails to show, and we fail to see, how any possible error in this regard was not harmless. See MCR 3.902(A); MCR 2.613(A). At the conclusion of trial, the jury found by a preponderance of the evidence that there were grounds to exercise jurisdiction over the children pursuant to MCL 712A.2(b)(1) because they were "subject to a substantial risk of harm to [their] mental well-being." This jurisdictional basis does not implicate the definition of "neglect" that respondent complains of on appeal, and only one statutory ground need be proven for the court to assume jurisdiction over the children. *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008); see also MCR 3.972(E). Accordingly, even if the trial court erred when instructing the jury on the definition of "neglect" at trial, the error was harmless, and respondent is not entitled to relief on this issue. MCR 3.902(A); MCR 2.613(A); *Ward*, 472 Mich at 84.

## V. REASONABLE EFFORTS

Respondent next argues that the trial court erred by terminating her parental rights because DHHS failed to make reasonable efforts toward reunification. The only service that respondent challenges in raising this argument is parenting time, arguing that she should not have been denied parenting time because there was no evidence that parenting time, even if supervised, would have been harmful to the children. We review for clear error "a trial court's findings regarding reasonable reunification efforts." *Matamoros*, ___ Mich App at ___; slip op at 4. And we review a trial court's decision to suspend or modify parenting time for an abuse of discretion. *In re Laster*, 303 Mich App 485, 490-491; 845 NW2d 540 (2013), superseded by statute on other grounds as recognized by *In re Ott*, 344 Mich App 723, 738-741; 2 NW3d 120 (2022).

In general, when a child is removed from a parent's custody, DHHS must make reasonable efforts toward reunification, but it need not do so under certain, limited circumstances. *In re Walters*, ___ Mich App ___, ___; ___ NW3d ___ (2025) (Docket No. 369318); slip op at 3-4; see also MCL 712A.19a(2). Reasonable efforts include "creat[ing] a service plan outlining the steps that both [DHHS] and the parent will take to rectify the issues that led to court involvement and to achieve reunification." *Matamoros*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted). A case service plan must provide a respondent with "a schedule for regular and frequent parenting time" with his or her child "unless parenting time, even if supervised, would be harmful to the child." MCL 712A.18f(3)(e). "The adequacy of [DHHS]'s efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights." *Matamoros*, ___ Mich App at ___; slip op at 4 (quotation marks and citation omitted).

As noted, respondent argues that she should not have been denied parenting time because there was no evidence that parenting time, even if supervised, would be harmful to the children. In its petition, however, DHHS requested termination at initial disposition due to allegations of sexual abuse and misconduct by respondent's live-together partner and respondent's failure to protect the children from such harm. And, as a result, the trial court immediately suspended respondent's parenting time on that basis at the preliminary hearing. Because DHHS requested termination at initial disposition and, thus, did not prepare a case service plan, MCL 712A.18f(3)(e) is not applicable in this case. Rather, MCR 3.965(C)(7)(a) is. That court rule governs parenting time during the period between the preliminary hearing and adjudication, see *Ott*, 344 Mich App at 738, and therefore applied at the time of the trial court's decision regarding parenting time. It provides, in relevant part, that "[u]nless the court suspends parenting time pursuant to MCL 712A.19b(4) . . . , the court must permit each parent frequent parenting time with a child in placement unless parenting time, even if supervised, may be harmful to the child." MCR 3.965(C)(7)(a). MCL 712A.19b(4), in turn, provides that "[i]f a petition to terminate parental rights to a child is filed, the court may suspend parenting time for a parent who is a subject of the petition." Accordingly, because the trial court suspended respondent's parenting time during the pretrial proceedings on this basis, the court was not required to first find that "parenting time, even if supervised, may be harmful to the child." MCL 3.965(C)(7)(a). Respondent has shown no error in this regard.

## VI. IMPROPER RELIANCE ON DOMESTIC VIOLENCE

Respondent also argues that the trial court erroneously relied on her status as a victim of domestic violence as a basis for termination of her parental rights. To the extent that the trial court relied on respondent's status as a domestic-violence victim when making its findings in support of termination, we agree that the court erred by doing so.[6] See *In re Jackisch/Stamm-Jackisch*, 340 Mich App 326, 334; 985 NW2d 912 (2022) ("The fact that [a] respondent was or is a *victim* of domestic violence may not be relied upon as a basis for terminating parental rights."); see also MCR 3.977(K) (requiring reviewing courts to apply "[t]he clearly erroneous standard" to a trial court's "findings on appeal from an order terminating parental rights"). Any error in this regard, however, was harmless. See MCR 3.902(A); MCR 2.613(A).

As to the statutory grounds for termination, respondent does not otherwise challenge the court's findings in support of MCL 712A.19b(3)(g) and (j).[7] And even when excluding all

---

[6] We note that not all of the trial court's references to domestic violence related to respondent's status as a domestic-violence *victim*. For instance, the court referenced respondent's prior act of domestic violence against NC, for which she was convicted of third-degree child abuse, as well as MC2's report of respondent perpetrating domestic violence against her partner on at least one occasion. Respondent has not shown, nor do we see, anything improper about the court considering testimony regarding these incidents.

[7] These provisions permit termination of parental rights under the following circumstances:

> (g) The parent, although, in the court's discretion, financially able to do so, fails to provide proper care or custody for the child and there is no reasonable

references to respondent's status as a domestic-violence victim—or even when excluding all references to domestic violence as a whole—the record still amply supports the court's findings as to these grounds. For instance, the primary basis for the court's findings as to these statutory grounds for termination was that respondent's live-together partner had repeatedly sexually abused WC and engaged in sexual misconduct around all of the children, and that respondent had failed— and given her continued relationship with her partner, would continue to fail—to protect the children from these harms. Testimony from a multitude of witnesses, including a detective, a CPS investigator, MC1, NC, and respondent, all clearly established that respondent knowingly began a relationship with an individual who had been convicted of sexual offenses involving a minor, invited that individual to live with her and her minor children, and regularly allowed him to be around the children unsupervised, despite multiple warnings not to do so. There was also significant testimony from MC1 and NC regarding the specific instances of sexual abuse and misconduct by respondent's partner, which the court found to be much more credible than respondent's testimony about those matters, and we see no basis to disrupt that credibility assessment here. See *Matamoros*, ___ Mich App at ___; slip op at 4. And regarding the court's best-interests determination, for reasons explained more fully below, there was, even absent any mention of domestic violence related to respondent, still well more than a preponderance of the evidence to support the court's finding that termination was in the children's best interests. Accordingly, respondent has not demonstrated that she is entitled to relief on this issue. See MCR 3.902(A); MCR 2.613(A).

## VII. BEST INTERESTS

Lastly, respondent challenges the trial court's determination that termination was in the children's best interests. We review for clear error a lower court's decision that termination is in a child's best interests. *In re Olive/Metts Minors*, 297 Mich App 35, 40; 823 NW2d 144 (2012). "[W]hether termination of parental rights is in the best interests of the child must be proved by a preponderance of the evidence." *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013).

When determining whether termination is in a child's best interests, the court should place its "focus on the child rather than the parent." *In re Schadler*, 315 Mich App 406, 411; 890 NW2d 676 (2016). "The trial court should weigh all the evidence available to determine the child's best interests," and it should consider a variety of factors, including "the child's bond to the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home." *In re Simpson*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 368248); slip op at 5 (quotation marks, citations, and alterations

---

expectation that the parent will be able to provide proper care and custody within a reasonable time considering the child's age.

\* \* \*

(j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent. [MCL 712A.19b(3)(g) and (j).]

omitted). The court may also consider, among other things, "the parent's history," psychological evaluations, the child's age, and "the child's well-being while in care," *MJC*, ___ Mich App at ___; slip op at 10 (quotation marks, citations, and alteration omitted), as well as "how long the child was in foster care or placed with relatives, along with the likelihood that the child could be returned to the parents' home within the foreseeable future, if at all," *In re CJM*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 367565); slip op at 4 (quotation marks and citation omitted). The court must also expressly consider a child's placement with a relative, which ordinarily weighs against termination. *Id.* When more than one child is involved in the proceedings, the court must consider each child's best interests individually, but it need not make "redundant factual findings" as to matters for which the children's best interests are the same. *In re White*, 303 Mich App 701, 715-716; 846 NW2d 61 (2014).

Respondent argues, albeit briefly, that the trial court failed to explicitly address why termination was in the children's best interests in light of their relative placement with their father. The record, however, indicates otherwise. When making its findings, the court specifically noted that the children were placed with their father. The court also stated that although it ordinarily "would have to find that placement with a relative would weigh against the termination of parental rights," it believed that this "factor, at best, [wa]s neutral" in this case because, while respondent and the children's father were still legally married at the time, it was "clear that the minor children shouldn't be placed with" respondent. Thus, contrary to respondent's assertion, the court expressly considered the children's relative placement as it was required to do. See *CJM*, ___ Mich App at ___; slip op at 4.

Respondent also argues that the trial court failed to consider the best interests of each child individually and, relatedly, that the evidence established that respondent's home was preferable to that of the children's father because she could better care for each child's particularized needs. Again, the record indicates otherwise. In making its findings, the trial court acknowledged the children's varying ages and that, in particular, MC1 and WC were differently situated than NC and MC2 because they were the ones specifically victimized by respondent's partner, but the children were nonetheless similarly situated in many respects. The court found—and the record supports— that although respondent could provide for all of the children's physical needs, such as food, clothing, shelter, and medical care, she could not provide for any of the children's safety and well- being, and that each child's need for safety, security, and stability outweighed any bond with respondent and respondent's general parenting ability.

In addition, testimony established that WC indicated that she did not want to return to respondent's care, that MC1 and NC specifically reported that they did not want to return to respondent's care, and that MC2 expressed, at best, indifference about returning to respondent's care. And indeed, according to the caseworker, NC, MC2, and WC all expressed indifference about even having any further contact with respondent, and MC1 expressly stated that she did not wish to have any further contact with respondent. Meanwhile, testimony established that the children's father had properly provided for all of the children's basic needs, the children's safety and mental well-being had markedly improved while in his care, and all of the children expressed that they loved living with him. Respondent does not put forth any evidence suggesting that the children's father could not properly provide for the children's needs and, in fact, the record indicates that the only time one of the children missed a medical appointment while in his care was due to respondent's interference.

-11-

It was also clear from the testimony that the proceedings had taken a toll on the children's mental health and that they desired some sense of permanency. The caseworker testified that all of the children became increasingly anxious before each court date and had each repeatedly expressed a desire to have the proceedings end. Permanency was particularly relevant in this case because the children were adopted by respondent and their father in 2016 after their biological parents' parental rights were terminated, so these termination proceedings were the second in the children's young lives. Respondent may disagree with how the court weighed these various considerations in determining the children's respective best interests, but she has not shown that the court reversibly erred in doing so.

Finally, respondent argues that DHHS did not submit as evidence any reports from a psychologist indicating that termination of her parental rights was in the children's best interests and that the court should have considered alternatives to termination given that the children were in their father's care, such as allowing the matter to be dispensed with in the ongoing child-custody case between respondent and the children's father. Regarding the former point, although a court, in evaluating a child's best interests, certainly *may* consider psychological evaluations if submitted, such reports are by no means required and their absence does not, in itself, betray an error in the court's determination. See *MJC*, ___ Mich App at ___; slip op at 10. And regarding the latter point, as discussed, the court duly considered the children's placement with their father in assessing whether termination was in the children's best interests. Furthermore, respondent's argument seemingly ignores that the primary purpose of these proceedings "is the *protection of children.*" *Nikooyi*, 341 Mich App at 497 (quotation marks and citation omitted; emphasis added). Indeed, "[t]he juvenile code is intended to protect children from unfit homes," *Leach*, 347 Mich App at 30 (quotation marks and citation omitted), and as detailed above, serious concerns to that effect were duly brought before the court in the instant child-protective proceedings. Respondent may well have preferred for those proceedings not to commence or move forward, or for the concerns raised therein to be addressed only as a part of her child-custody case. But she has not shown how any such preference of her own may have amounted to a reversible error by the trial court in its assessment of the children's best interests, or in its handling of these proceedings more generally.

In sum, the record reflects that the trial court properly weighed all the evidence available to it at the time that it made its best-interests determination, *Simpson*, ___ Mich App at ___; slip op at 5, and we see no clear error in its findings, *id*. at ___; slip op at 3.

Affirmed.


/s/ Kirsten Frank Kelly
/s/ Philip P. Mariani
/s/ Matthew S. Ackerman